UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Robert Richardson,

    *Plaintiff,*

v.

Northwestern Memorial HealthCare *et al.*,

    *Defendants.*

No. 23 CV 0617

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Robert Richardson brings this suit against his former employer, Northwestern Medicine Regional Medical Group ("RMG"), and its parent company, Northwestern Memorial HealthCare ("NMHC") alleging unlawful termination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Before the Court is Defendants' motion for summary judgment. [Dkt. 41.][1] For the reasons below, the motion is granted.

## I.    Local Rule 56.1

The Court first addresses the parties' Local Rule 56.1 objections that bear on the facts of the case. Along with their summary judgment briefs, the parties filed statements of material facts as required by Local Rule 56.1. [Dkts. 42, 47–49.] The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Each statement of fact must be "concise." L.R. 56.1(d)(1). "To dispute an asserted fact, a party must cite specific evidentiary material

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

A party responding to an adversary's statement of facts may make objections based on admissibility, with the argument for the propriety of the objection in its brief. L.R. 56.1(e)(2) ("If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief."). If the Court overrules the objection and the party does not otherwise dispute the fact, however, the fact is deemed admitted. *Id.* "To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) (internal quotation omitted). The Court may require strict compliance with Local Rule 56.1. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023).

Defendants argue that many of Richardson's responses to its L.R. 56.1 Statement contravene L.R. 56.1(e)(3) because they either dispute factual assertions without explanation or raise specific objections (on hearsay, foundation, or relevance grounds) but fail to explain how the objections apply. Other responses also fail to cite any supporting evidence. [Dkt. 50 at 2–6.] The Court agrees. The Local Rules make clear that a party disputing a fact must cite and explain the basis for its challenge. Richardson failed to do one or both in response to paragraphs 12, 15, 17, 19, 22–26, 45–53, 56–64, and 72. Nor did he explain even a single objection in his response brief,

as required by L.R. 56.1(e)(2). Consequently, unless a factual statement is clearly disputed from the face of Richardson's cited evidence or is otherwise inadmissible, the Court will consider Defendants' factual assertions admitted.

Next, Richardson objects to the existence of an "APP care model" in paragraphs 42–53 and 62 because Defendants didn't produce written documentation of the model or policies for its implementation to support the deposition testimony that Defendants cite to prove the model's existence. This is not a valid objection because Federal Rule of Civil Procedure 56(c)(1)(A) expressly states that deposition testimony can be used to support a factual assertion. This objection is also contradicted by the evidence, which shows that Dr. Babak Jahromi delivered a PowerPoint presentation of the model to other hospital leaders. [Dkt. 49, ¶ 36.]

Defendants also object to multiple assertions in Richardson's Statement of Additional Material Facts, arguing that they include inadmissible hearsay, are statements made without personal knowledge, lack evidentiary support, or are immaterial. [Dkt. 50 at 7–9.] The Court addresses these objections below where relevant.

## II.    Background

The following facts are taken from the parties' Local Rule 56.1 statements and attached exhibits. [Dkts. 42, 47–49.] The Court presents the facts in the light most favorable to the non-moving party. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). These facts are undisputed except where a dispute is noted.

3

### A.    RMG Structure and Personnel

Northwestern Regional Medial Group ("RMG") consists of the medical group working at Northwestern Medicine's suburban ambulatory sites including, as relevant here, Northwestern Medicine Central DuPage Hospital ("CDH") and Northwestern Medicine Delnor Hospital ("Delnor"). [Dkt. 48, ¶ 2.] CDH and Delnor are "level two" trauma centers for which on-call neurosurgeons must be able to independently review any cases requiring urgent evaluation or surgical intervention, and to perform surgery if needed. [*Id.*, ¶ 14.] Delnor is smaller than CDH and has less capacity. [*Id.*, ¶ 34.] RMG neurosurgeons working at CDH and Delnor share a call pool such that a neurosurgeon on call would typically cover call for both hospitals. [*Id.*, ¶ 15.][2]

Apart from neurosurgeons, RMG medical staff include "advanced practice professionals" or "advanced practice providers" ("APPs"), which encompass advanced nurse practitioners ("APRNs") and physician assistants ("PAs"). [*Id.*, ¶ 13.] Among other things, APPs supporting neurosurgeons assist primary surgeons during neurological procedures, see patients in clinic and inpatients, "round" on patients in different settings, look after outpatient requests, and help with call coverage. APPs cannot be the "primary" person on call, so a neurosurgeon must be on call with an APP. [*Id.*, ¶ 18.] APPs were paid between $110,000 and $160,000. [Dkt. 49, ¶ 38; Towne Tr. at 64:15–64:20.]

---

[2]    Richardson disputes paragraph 15 without explaining what he disputes. The testimony he cites doesn't contradict the factual assertion, so it is deemed admitted.

4

Dr. Patrick Towne has served as President of RMG since 2014.[3] As President, he manages RMG's operations and is responsible for hiring and firing RMG neurosurgeons, including those at CDH and Delnor. [Dkt. 48, ¶ 3.] In the relevant period, Dr. Towne would typically consult Drs. Babak Jahromi and Andrew Chenelle (now deceased) in the employment of RMG neurosurgeons. [*Id.*, ¶ 4.]

### B. Richardson's Employment and Capabilities

Plaintiff Robert Richardson is a board-certified neurosurgeon.[4] [Dkt. 49, ¶ 29.] In or around 2017, RMG hired neurosurgeon Dr. John Brayton, who had worked with Richardson in private practice for about 15 years. After Dr. Brayton was hired, he pushed for RMG to hire Dr. Richardson as well. [Dkt. 48, ¶¶ 9–11.] Dr. Towne met with Richardson and ultimately hired him as a neurosurgeon on August 28, 2017, without Dr. Jahromi's input. Dr. Richardson was 75 years old at the time and paid a standard neurosurgeon's salary ($180,000). [*Id.*, ¶¶ 6–8; Dkt. 49, ¶ 3.]

When Dr. Towne hired Richardson, he was under the impression that Richardson was assisting Dr. Brayton in private practice in an APP-like role. He understood from Dr. Brayton that Richardson assisted in the operating room, would see patients in the office, and help with postoperative care to free Dr. Brayton up to

---

[3]     Dr. Towne is also a senior vice president of NMHC but it's undisputed that he terminated Richardson in his capacity as President of RMG. [Dkts. 48, ¶ 66; 49, ¶ 1.]

[4]     Richardson argues that Dr. Towne understood him to be an *independent* board-certified neurosurgeon because he and Dr. Towne "discussed the fact that Richardson was a fully independent board-certified neurosurgeon" during Richardson's interview. [Dkt. 49, ¶ 2.] It's unclear what "independent" means in this context and the testimony cited doesn't show that Dr. Towne agreed that Richardson was working independently. [*See* Dkt. 42-2 ("Richardson Tr.") at 63:22–64:5.] It's also immaterial since Richardson doesn't properly dispute that Dr. Towne understood Richardson to be assisting Dr. Brayton in an APP-like role before and after being hired by RMG. [Dkt. 48, ¶¶ 17, 19.]

work "top of license" in the operating rooms. He also understood that Richardson would continue in a similar role at RMG, acting as a surgical assistant to Dr. Brayton and under his supervision. [Dkt. 48, ¶ 19.] In this way, he considered Richardson a "very unusual fit" for an assisting role since RMG typically had APPs for support. [*Id.*, ¶ 17.][5]

While employed by RMG, Richardson worked exclusively and only took call at Delnor rather than Delnor and CDH as other neurosurgeons did. [*Id.*, ¶¶ 15–16.] Richardson reported immediately to Dr. Chenelle (medical director of neurosurgery at CDH and Delnor), who reported to Dr. Jahromi. [*Id.*, ¶ 33.]

The parties dispute the scope and limitations of Richardson's role at Delnor. By Richardson's account, he could cover call independently. [*Id.*, ¶ 20; Dkt. 42-7 ("Brayton Tr.") at 24:6–13.] But it's undisputed that he could only cover Delnor, and Richardson couldn't recall doing so independently while being employed by RMG. [Dkt. 48, ¶ 21; Dkt. 42-2 ("Richardson Tr.") at 167:6–168:13.][6] Dr. Jahromi, who coordinated and clinically oversaw neurosurgeons as Vice Chair for Regional Neurosurgery for Northwestern Medicine, [*id.*, ¶ 5], understood from Richardson, Dr. Brayton, and other faculty members that Richardson couldn't cover call independently because he couldn't independently decide to take someone into the

---

[5]     Richardson disputes paragraphs 17 at 19 but doesn't explain what he disputes and the testimony he cites from Dr. Brayton doesn't contradict either fact statement. Paragraphs 17 and 19 are admitted.

[6]     Richardson disputes paragraph 21, stating that he just couldn't recall specific dates in which he acted as the primary on-call neurosurgeon for Delnor. This does not dispute the fact statement because Richardson stated that he couldn't recall at all whether he was the primary any time after he was employed by RMG in 2017 and never affirmatively stated that he was. [Richardson Tr. at 167:6–168:13.] Paragraph 21 is admitted.

operating room and conduct surgery. Another faculty in neurosurgery would always be with him. And because he could only cover Delnor, another neurosurgeon would need to be on call to cover CDH regardless. [Dkt. 48, ¶ 20; Dkt. 42-5 ("Jahromi Tr.") at 39:8–21; 42:11–17; 53:24–55:15.] Dr. Towne had the same impression. [Dkt. 48, ¶ 19; Dkt. 42-6 ("Towne Tr.") at 69:1–10.][7]

Similarly, Richardson maintains that he performed the work of a neurosurgeon rather than an APP at Delnor. In the operating room, an APP would typically assist in, for example, retraction or manipulation of tissue, irrigation, suction, and suturing. APPs could essentially perform the role of a neurosurgeon in an emergency, but generally only give instructed assistance. [Dkt. 48, ¶ 24; Brayton Tr. at 40:12–23.][8] Richardson was always present for surgical assists with Dr. Brayton, would help with complex spine cases, spinal tumors, etc. [Dkt. 49, ¶ 4.] He also rounded on patients, discussed cases with Dr. Brayton, reviewed charts and records, and looked into things that didn't seem right. [*Id.*, ¶ 10.] The parties dispute whether Richardson performed any tasks that an APP could not perform. [Dkt. 48, ¶¶ 25–26.] However, Dr. Towne's

---

[7]     Richardson disputes paragraphs 19 and 20 but his cited testimony from Dr. Brayton doesn't contradict the assertion that Drs. Towne and Jahromi understood Richardson was not working as an independent neurosurgeon because he required a backup surgeon for call and could not perform surgeries independently. Dr. Brayton explained that he and Richardson were responsible for most surgical and emergency neurosurgical procedures at Delnor and that Richardson took call at Delnor. [Brayton Tr. at 19–21; 26–28, 77.] Even if Richardson was performing many neurosurgical tasks with expert skill, this does not mean he could do so independently, without another surgeon present. Paragraphs 19 and 20 are admitted.

[8]     Richardson disputes paragraph 24 but doesn't explain what he disputes and the testimony he cites doesn't contradict it. Paragraph 24 is admitted.

understanding was that Richardson was basically operating as an APP. [*Id.*, ¶ 27.][9] And according to Dr. Brayton, Richardson could not be listed as the primary surgeon because he had his own private insurance rather than insurance through Northwestern. [Dkt. 49, ¶ 4; Brayton Tr. at 11:5–13:10.]

### C. APP Care Model

In his administrative capacity as Vice Chair for Regional Neurosurgery for Northwestern Medicine, Dr. Jahromi began discussing an APP care model with his colleagues in 2018. The care model would require each RMG neurosurgeon to "practice at the top of their license," by independently covering call, doing surgeries, and managing their practice with support from APPs. [Dkt. 48, ¶¶ 42–44.] While RMG already had APPs supporting the neurosurgical practice, Dr. Towne thought that the APP care model needed to expand the existing number of APPs to better support the neurosurgical team covering CDH and Delnor. Dr. Towne also understood from RMG neurosurgeons that the shared call coverage was difficult and leading to burnout. This was, in his view, a "chief driver" of the new APP care model. He had discussions with Dr. Jahromi prior to March 2020 about how to evolve the model to add more bandwidth at CDH and Delnor. [*Id.*, ¶¶ 45–47.] RMG contemplated a "team coverage model" in which APPs would provide fluid coverage across both hospitals. Discussion of the model, which would be deployed across RMG sites, began in 2018

---

[9]     Richardson disputes paragraph 27, arguing that Dr. Towne's testimony about Richardson's role lacks foundation and is irrelevant because Dr. Towne isn't a surgeon and didn't directly observe Richardson's work. This does not contradict the point that Dr. Towne's *impression* and *belief* was that Richardson was operating as an APP. His understanding, even if mistaken, wasn't speculative because it was based on conversations with Drs. Brayton and Jahromi about how Richardson would and did fit into RMG's model of care. [Dkt. 48, ¶ 19.] Paragraph 27 is admitted.

8

but was implemented in a piecemeal fashion according to the time each hospital needed to recruit APPs and implement the model. [*Id.*, ¶¶ 43, 48–49.] Although RMG already had APPs, RMG was trying to expand the APP care model to better support neurosurgeons. [*Id.*, ¶ 45.][10]

In addition to adding more APPs, Dr. Towne wanted to hire more neurosurgeons to reduce the call burden on CDH and Delnor. Dr. Towne's understanding, however, was that RMG was subject to "financial guardrails" in adding physicians and that there needed to be a "financial case" made to hire more neurosurgeons. [*Id.*, ¶¶ 52–53; Towne Tr. at 96:14–98:02.] But Dr. Towne learned from RMG's financial team that they couldn't make such a case because the measured collective productivity of the neurosurgeons was too low to justify new hires. [Dkt 48, ¶ 59; Towne Tr. at 97:09–98:2.][11]

RMG measured productivity in Relative Value Units ("RVUs") assigned to procedures and other revenue-generating services performed at RMG. [Dkt. 48, ¶¶ 35, 54.] RVU amounts varied by service and procedure, but the role of a primary surgeon was "always" associated with higher RVUs than an assisting role. [*Id.*, ¶ 36.]

---

[10]   Richardson disputes paragraphs 45, 48–49 but his hearsay and foundation objections are unexplained and his objection to the lack of written documentation of the APP care model is meritless. *See supra* Part II. Paragraphs 45, 48–49 are admitted. Richardson also disputes the novelty of the APP care model in his L.R. 56.1 Statement, stating that RMG already had a pre-pandemic APP care model in place prior to Dr. Brayton's employment. [Dkt. 49, ¶ 34.] But his cited evidence does not support this statement. It's also contradicted by Richardson's admission that Dr. Jahromi made a presentation to hospital leaders regarding enhanced APP support to the neurological team. [*Id.*, ¶ 36.] Furthermore, Defendants' position is that RMG was changing and expanding the APP care model, not adding APPs for the first time.

[11]   Richardson disputes paragraphs 52–53 and 59 but his foundation and hearsay objections are unfounded. He also does not explain how his cited testimony contradicts the factual assertion. Since it does not clearly do so, paragraphs 52–53 and 59 are admitted.

Monthly or yearly productivity was assessed by adding up a provider's RVUs, with a higher number of RVUs indicating more productivity. [*Id.*, ¶ 37.]

RMG used RVUs to set expectations for each neurosurgeon's productivity and anticipate expenses to inform its overall fiscal-year budget. [*Id.*, ¶ 54.] A neurosurgeon's financial impact on RMG depended on their estimated productivity, actual RVU output, and associated expenses such as malpractice insurance covered by RMG. APPs, by contrast, were not required to have malpractice insurance. [Dkt. 48, ¶ 55.] In Dr. Towne's assessment, Richardson's continued employment translated into a higher expense to RMG than an APP's employment, but in exchange for services that could largely be performed by an APP since he believed that Richardson was not conducting surgeries or covering call independently. [*Id.*, ¶¶ 55–56.][12]

RMG compared the actual productivity of RMG neurosurgeons against an external benchmark to inform RMG's hiring decisions. [*Id.*, ¶ 57.] To measure productivity, RMG would calculate the collective productivity of the neurosurgeons by averaging the RVUs for each neurosurgeon. Dr. Towne was aware that the collective productivity of CDH and Delnor neurosurgeons had been below benchmark for some years prior to Covid and before Dr. Brayton was hired in 2017. [*Id.*, ¶¶ 58–59; Dkt. 49, ¶ 31.] He also believed that RMG needed to raise the collective productivity of the neurosurgeons to financially justify hiring another neurosurgeon

---

[12]    Richardson disputes paragraph 56 but does not explain how his cited testimony contradicts the factual assertion. Since it does not clearly do so, paragraph 56 is admitted.

to bring down the call burden. [Dkt. 48, ¶ 60.][13] Richardson's RVUs were factored into the collective RVU measurement and his RVUs were lower than other surgeons' during March–May 2020. [*Id.*, ¶¶ 40, 59.] The parties dispute Richardson's RVUs and performance pre-Covid, but this is immaterial because it does not alter Drs. Towne and Jahromi's beliefs about the role Richardson was performing as compared to other neurosurgeons, and because Defendants do not argue Richardson was terminated due to his performance.[14] [Dkt. 50 at 14.]

### D. Richardson's Termination

In March 2020 after the onset of the Covid pandemic, Dr. Brayton received a call from Dr. Chenelle, after which he instructed Richardson to leave the hospital immediately and stay home. [Dkt. 49, ¶ 15; Brayton Tr. at 70:9–70:16.] Richardson provided telehealth services during this time. [Richardson Tr. at 163:1–163:13.] He requested to return to work in May, June, and July 2020 but the requests were denied.[15] [Dkt. 49, ¶¶ 17–18.]

Prior to Richardson's termination in September 2020, Drs. Towne and Jahromi had discussed whether Richardson fit into the APP care model and ending his employment. Neither thought his role was conducive to the model of APPs supporting

---

[13]     Richardson disputes paragraphs 57–60 but does not explain how his cited testimony contradicts the factual assertion. Since it does not clearly do so, paragraphs 57–60 are admitted.

[14]     RMG's factual assertion that Richardson's pre-Covid RVUs were lower than other surgeons' is inadmissible hearsay because it is based on Dr. Jahromi's testimony about the contents of RVU documentation that were not produced. [Dkt. 48, ¶ 39.] *See Jackson v. Vill. of Univ. Park*, 2019 WL 1928801, at *8 (N.D. Ill. Apr. 30, 2019) (holding that plaintiff's testimony about the contents of a document was hearsay) (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)).

[15]     The parties didn't address whether he returned to work after July 2020.

neurosurgeons to practice at the top of their licenses because Richardson, they believed, couldn't perform surgeries or cover call independently. [Dkt. 48, ¶¶ 50–51.] Dr. Towne also believed that his employment was more expensive for RMG than an APP, except that an APP could do most of what Richardson was doing. [*Id.*, ¶ 56.] He believed that terminating Richardson would put RMG in a better position to raise the collective productivity of the neurosurgeons and that it would give RMG a better chance of financially justifying new neurosurgeon team hires, including APPs who could support doctors in both hospitals, and more neurosurgeons who could alleviate the shared call burden. He considered this the primary reason for ending Richardson's employment. [*Id.*, ¶¶ 61–62; Towne Tr. at 100:2–101:7.][16]

Sometime after July 4, 2020, Dr. Jahromi emailed a group of physicians to state that he and Dr. Towne had discussed Richardson leaving RMG. [Dkt. 49, ¶ 22.] On September 2, 2020, Drs. Towne and Jahromi met with Richardson to communicate their decision to terminate him, effective December 31, 2020. They explained that he was being terminated in part because of RMG's transition to the new APP care model and their desire to add APPs and ideally another neurosurgeon to reduce the call burden on CDH and Delnor. Neither mentioned his age as a reason, and the parties dispute whether they knew Richardson's age. [Dkt. 48, ¶¶ 64–65.][17] Dr. Towne signed Richardson's termination letter in his capacity as President of RMG. [*Id.*, ¶ 66.]

---

[16]    Richardson disputes paragraphs 50–51, 56, and 61–62 but does not explain how his cited evidence contradicts it, and the evidence does not clearly do so. His foundation and hearsay objections are unfounded. Paragraphs 50–51, 56, and 61–62 are admitted.

[17]    Richardson disputes paragraph 64 but does not explain how his cited evidence contradicts it, and the evidence does not clearly do so. Paragraph 64 is admitted.

After Richardson's departure, RMG added APPs to CDH and Delnor and Dr. Towne perceived a decrease in complaints about the difficulties of call coverage. RMG eventually hired more neurosurgeons, but not until 2023 or 2024. Dr. Towne attributed the delay to the effects of the Covid pandemic on neurosurgeons' collective productivity. [*Id.*, ¶¶ 69–72.][18]

Richardson filed this suit against RMG and its parent company, Northwestern Memorial HealthCare ("NMHC"), alleging discrimination in violation of the ADEA.

## III.  Legal Standard

"Summary judgment is proper when the moving party . . . 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). The Court also "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).

---

[18]    Richardson disputes paragraph 72 concerning Dr. Towne's belief that Covid dampened productivity, but the cited evidence does not contradict it. Paragraph 72 is admitted.

## IV. Analysis

### A. Employer Liability

As a preliminary matter, Defendants argue that NMHC is entitled to summary judgment because RMG, not NMHC, was Richardson's employer. [Dkt. 43 at 8–9.] The ADEA's anti-discrimination provision only creates liability for "an employer." 29 U.S.C. § 623(a)(1). In some cases, a plaintiff may have more than one employer, referred to as a "joint" or "*de facto*" employer. *See, e.g.*, *EEOC v. Illinois*, 69 F.3d 167, 171 (7th Cir. 1995) (recognizing theory of *de facto* employer liability in ADEA context); *Gross v. Peoples Gas Light & Coke Co.*, 634 F. Supp. 3d 464, 483–84 (N.D. Ill. 2022) (discussing joint employer liability). To determine whether an entity qualifies as a plaintiff's employer, courts apply a five-factor "economic realities" test, "which is, in its essence, an application of general principles of agency law to the facts of the case." *Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018) (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991)). Those factors are:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Id.* (quoting *Knight*, 950 F.2d at 378–79); *see also Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015) (explaining that the five-factor test is simply a "more structured" version of control tests employed in other cases (citing *EEOC v. Illinois*,

14

69 F.3d)). The "employer's right to control" is the most important factor and must be given the most weight. *Frey*, 903 F.3d at 676.

The parties agree that Richardson was employed by RMG, but dispute whether RMG's parent company, NMHC, was a joint employer. On one hand, Richardson received his letter of intent from, executed an employment agreement with, and was fired by RMG, and reported to, was supervised by, and "under the control of" RMG for the employment period relevant to his claims. [Dkt. 48, ¶ 12; Dkt. 42-3; Dkt. 42-4.][19] On the other hand, NMHC paid Richardson for at least some period during his employment. [Dkt. 49, ¶ 28; Richardson Tr. at 52:12–52:15 ("Q: Who was your employer? A: [E]ventually it was [NMHC]. That's who paid me, I believe.")]

It's clear from these undisputed facts that NMHC does not qualify as Richardson's joint or *de facto* employer. The most important factor of the economic realities test—employer control—proves the point because Richardson admits that RMG, not NMHC, supervised and controlled his employment. While NMHC may have paid Richardson, this alone is insufficient to show that NMHC was a joint employer when RMG was the only entity that exercised any form of control over Richardson. NMHC is entitled to summary judgment for lack of an employment relationship required by the ADEA.

## B. ADEA Discrimination Claim

The ADEA protects workers 40 years and older from age-based employment discrimination, providing that it is unlawful for an employer to "discharge . . . or [ ]

---

[19] Richardson disputes paragraph 12 but does not explain how his cited evidence contradicts it, and the evidence does not clearly do so. Paragraph 12 is admitted.

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Summary judgment is inappropriate if "the evidence would permit a reasonable factfinder to conclude that [Richardson's age] caused the discharge or other adverse employment action." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). However, "in the ADEA context, it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009) (emphasis in original); *see also Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 997 (7th Cir. 2024), *cert. denied*, 2025 WL 746327 (U.S. Mar. 10, 2025).

An ADEA plaintiff may prove discrimination either in a "holistic" fashion under *Ortiz* or using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, which gives the plaintiff the initial burden to establish a *prima facie* case of discrimination, after which "'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (internal quotation marks and citation omitted). Under either approach, the Court asks whether, looking at the record as a whole, a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class. *Id.* at 598; *Ortiz*, 834 F.3d at 764–65. Richardson addresses both approaches, and so will the Court.

16

To make out a *prima facie* case of discrimination under the ADEA, a plaintiff must show that (1) he is protected under the ADEA; (2) he performed to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment. *Avancez*, 39 F.4th at 434. Richardson failed to establish a *prima facie* case because he neglected to even attempt to identify a comparator—in fact, he avers that RMG neurosurgeons are different to such a degree that they cannot be compared with each other. [Dkt. 48, ¶ 28.] This immediately forecloses success under *McDonnell*.

Under the *Ortiz* framework, courts look at all the evidence together and ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] caused the discharge or other adverse employment action" at issue. 834 F.3d at 765. A plaintiff can point to direct or circumstantial evidence of discrimination to support their claim. Direct evidence is "what [the employer] said or did in the specific employment decision in question." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (internal quotation marks and citation omitted). Circumstantial evidence is "evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). In determining whether an employer's justification for an adverse

17

employment action is pretextual, courts only inspect the honesty of the employer's motivation, not the wisdom of their decision. *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024) ("[T]he court 'is not a super personnel department that second-guesses employers' business judgments.'" (quoting *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017))).

Richardson cites three statements from Dr Brayton's deposition as direct evidence of age discrimination:

- Dr. Brayton stated that Dr. Chenelle told him during the Covid pandemic that Richardson was high risk due to his age and should be sent home.[20] [Dkt. 46 at 9.]

- Dr. Brayton stated that in neurosurgery department team meetings led by Dr. Lesniak, Richardson was ordered to stay home "based on his health risk and Covid."[21] [*Id.*]

- Dr. Brayton stated that email summaries sent out after physician meetings discussed Richardson being denied leave to return to work because of his age. [*Id.*]

Most of these statements are inadmissible and none show that Richardson's age was the sole cause of his termination. The second and third claims contain inadmissible hearsay statements from unnamed physicians because they're offered to prove the truth of the matter asserted—that Richardson was ordered to stay home because of his age—and no hearsay exception applies. If a physician who played a role in Richardson's termination had made one of these statements, it could be

---

[20]    Richardson claims that Dr. Brayton also told him to go home because of his age, but the testimony cited shows that Dr. Brayton only told Richardson to "shelter at home" and didn't reference age. [Dkt. 49, ¶ 15.]
[21]    Richardson also claims that no one else was ordered to stay home, but the cited testimony only states that Dr. Brayton was not himself aware of anyone else being ordered to stay home. [Dkt. 49, ¶ 16.]

admissible as the statement of a party opponent. Fed. R. Evid. 801(d)(2); *see Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 992 (7th Cir. 2016) (to fall within the 801(d)(2) exclusion from hearsay, an employee's "duties must encompass some responsibility related to the decision-making process affecting the employment action." (cleaned up)). But there's no claim or information about who was involved in these communications or who cited Richardson's age as a factor, so they remain inadmissible and cannot be considered at summary judgment.[22]

Nor do any of the three statements cited show that Richardson was terminated solely because of his age. First, Defendants correctly argue that these statements are not "direct" evidence of discrimination. [Dkt. 50 at 11–12.] To be considered "direct," evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2005) (internal quotation marks and citation omitted); *see also Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (defining "direct evidence" in the discrimination context as "an overt admission of discriminatory intent" that "is rare, and not at issue where, as here, no supervisor admits" that he was motivated by discriminatory animus). The evidence must also relate to the specific employment decision in question. *Rudin*, 420 F.3d at 720; *Lochard v. Provena*

---

[22]     Dr. Chenelle's statement as recounted by Dr. Brayton is admissible as the statement of a party opponent. Fed. R. Evid. 801(d)(2); *Bordelon*, 811 F.3d at 992. It's unclear whether Dr. Chenelle was involved in Richardson's termination since the parties' Rule 56.1 statements and evidence only indicate that Drs. Towne and Jahromi were involved. But since they agree that Dr. Towne would generally consult both Drs. Jahromi and Chenelle in terminating employees, the Court will assume Dr. Chenelle was consulted. This does not change the outcome.

*St. Joseph Med. Ctr.*, 367 F. Supp. 2d 1214, 1218 (N.D. Ill. 2005). Richardson's proffered evidence isn't direct because it relates to the reason Richardson was required to work from home during Covid, not the reason he was terminated. There's also no evidence that the latter two statements were made by anyone involved in Richardson's termination. The Court can consider Dr. Chenelle's statement (the only admissible statement) that Richardson was high risk due to his age and should be sent home as circumstantial evidence. Even so, it's still unavailing; that Dr. Chenelle's statement is unrelated to Richardson's termination necessarily leads to the conclusion that it doesn't show age was a but-for-cause of his termination, as required to prove an ADEA discrimination claim. As explained below, Drs. Towne and Jahromi determined that Richardson didn't fit into its evolving care model because they believed that he wasn't functioning as an independent surgeon, even prior to Covid. [Dkt. 48, ¶¶ 17, 19–20, 50–51.] Why he was sent home during Covid is unrelated to and does not undermine this separate business justification.

Richardson points to other circumstantial evidence of age discrimination to demonstrate that Defendants' non-discriminatory reason for terminating him was pretextual. Pretext "requires more than showing that the decision was mistaken, ill-considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (internal quotation marks and citation omitted). Richardson can "demonstrate pretext directly by showing that a discriminatory reason more likely motivated his termination, or indirectly by showing that [the employer's] explanations are unworthy of credence." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009)

(internal quotation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness, not the accuracy, of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Defendants maintain that Drs. Towne and Jahromi terminated Richardson because he didn't fit into RMG's evolving APP care model. As they explain it, RMG sought to increase the number of APPs supporting neurosurgeons to provide fluid support across CDH and Delnor and enable neurosurgeons to work at the top of their licenses. RMG also wanted to grow the neurosurgical team to lessen the call burden on the two hospitals. Drs. Towne and Jahromi believed that Richardson was performing an APP-type role (in assisting Dr. Brayton, but generally not acting as a primary surgeon) with correspondingly lower RVUs but at a higher expense than an APP, which was inconsistent with RMG's future plans. Defendants also maintain that Richardson was not terminated because his RVUs were lower than that of other neurosurgeons, but because he had a role that naturally led to lower RVUs. This ultimately hurt RMG's ability to make a financial case to hire more people. Additionally, Richardson's call coverage didn't lessen the call burden on neurosurgeons because he could only cover Delnor, so another surgeon would need to be on CDH call simultaneously. He also could not cover call independently and always required another surgeon. [Dkt. 43 at 11; Dkt. 50 at 12–14.]

Richardson argues that this business justification is pretextual for a number of reasons. First, he claims that RMG was not transitioning to an APP care model when Richardson was terminated in 2020. [Dkt. 46 at 11.] But the evidence he cites in his Rule 56.1 Statement doesn't speak to this issue. [Dkt. 49, ¶¶ 34–35.] Furthermore, Defendants agree that RMG already had APPs prior to 2018—the point of the new model was simply to expand the existing APP model and restructure the neurosurgical team. Richardson does not dispute this, or the fact that Dr. Jahromi presented this idea to hospital leaders during a presentation.

Richardson also argues that he did in fact operate as an independent neurosurgeon by acting as the primary neurosurgeon for neurosurgical operations and providing independent call coverage. [Dkt. 46 at 11–12.] The problem with Richardson's argument is that he never claims that Drs. Towne and Jahromi didn't honestly *believe* he was acting in an assistive role. [*See id.* at 2 (Drs. Towne and Jahromi "*assumed* Richardson could not perform surgeries independently or take call independently." (emphasis added)).] He also didn't properly refute Defendants' factual assertion that Drs. Towne and Jahromi understood him to be functioning like an APP for Dr. Brayton. [*See supra* Parts II.B, D; Dkt. 48, ¶¶ 19, 50–51.] If an employer makes a business decision on an erroneous but honestly believed and reasonable basis, it is not evidence of discrimination. *Formella*, 817 F.3d at 513.

Even if Richardson claimed dishonest intent, he has not come forward with evidence from which a jury might conclude pretext. To the contrary, RMG's business justification was reasonable. It's undisputed that neurosurgeons were expected to cover CDH and Delnor when on call, but Richardson could only cover the latter (with

a second surgeon) and another surgeon had to be simultaneously on call at CDH. [Dkt. 48, ¶ 21.] Consequently, Richardson was not providing independent coverage in line with RMG protocol. This conflicted with RMG's goal of reducing the call burden on RMG neurosurgeons and was a reasonable, non-discriminatory reason for Drs. Towne and Jahromi to seek to replace Richardson with another neurosurgeon who could cover both hospitals for the same expense.

Additionally, Richardson failed to show that Drs. Towne and Jahromi did not honestly believe that he was functioning more as an APP to Dr. Brayton than an independent neurosurgeon. Dr. Towne understood when he hired Richardson that this had been his role prior to RMG and that he would continue in it once RMG hired him. He also considered it an "unusual" role. [*Id.*, ¶ 17.] There is also some support for this belief in Dr. Brayton's deposition testimony, which explains that Richardson could never be listed as the primary surgeon because of his insurance. [Brayton Tr. at 11:5–13:10.] This was inconsistent with the evolving APP care model, which envisioned neurosurgeons working at "top of license" with APP assists. Additionally, given that RVUs were naturally higher for surgical than APP services, [Dkt. 48, ¶ 36] it wasn't unreasonable for Dr. Towne to assume that Richardson had lower RVUs than surgeons who were not acting as APPs. The parties dispute Richardson's actual RVUs pre-Covid and his Covid-era RVUs are not representative since he was working from home for part of that time. But regardless of whether Dr. Towne was wrong about Richardson's pre-Covid RVUs, he had a reasonable basis for believing Richardson would have lower RVUs. Given that Richardson was paid a neurosurgeon's salary, it was reasonable for Drs. Towne and Jahromi to believe that

23

letting him go would give them room to hire more APPs to do largely the same work for less, or another neurosurgeon who could do more. Terminating Richardson would also make way for neurosurgeons to operate in the independent role contemplated by RMG's APP care model.

Richardson raises a few other equally unavailing claims of pretext. He stresses that he was in good standing with the Northwestern Department of Neurosurgery, billed over $1 million, and was never disciplined, presumably to demonstrate that he was positively contributing to the neurosurgical practice. [Dkt. 46 at 12–13.] Defendants don't take issue with Richardson's skill or performance per se, but rather the disjunction between his role and RMG's staffing needs. Richardson also argues that Dr. Brayton's "opinion and impression" was that Richardson was discharged due primarily to his age. [*Id.* at 13.] But Dr. Brayton's opinion about why Richardson was discharged without any basis for that opinion is immaterial and insufficient to rebut Drs. Town and Jahromi's reasonable beliefs about why Richardson didn't fit into RMG's neurosurgical structure. His disagreement with the decision to terminate Richardson does not itself show that RMG's reasons for doing so were pretextual.

Finally, Richardson points out that RMG didn't hire another neurosurgeon until 2023 or 2024 even though it professed to discharge Richardson in part to hire other neurosurgeons. [Dkt. 46 at 13; Dkt. 48, ¶ 71.] Dr. Towne explained, however, that the delay was likely due to Covid dampening neurosurgeons' collective productivity. [Dkt. 48, ¶ 72.] The fact that Dr. Towne's goal of hiring more neurosurgeons didn't immediately succeed doesn't show that his stated strategy for

achieving this goal—discharging an employee who he believed wasn't working independently—was pretextual. *Galvan*, 117 F.4th at 939.

In summary, Drs. Towne and Jahromi reasonably believed that Richardson was not working as an independent neurosurgeon at Delnor or while on call and that this conflicted with its ability to expand the neurosurgical team. It was also inconsistent with the role neurosurgeons were intended to play in RMG's evolving APP care model. Because Richardson has not presented evidence from which a reasonable jury could conclude that these business justifications were dishonest, he cannot show that age was the sole cause of his termination and RMG is entitled to summary judgment. NMHC is also entitled to summary judgment because the undisputed evidence shows that it was not Richardson's joint or *de facto* employer.

## V.    Conclusion

For the reasons above, the motion for summary judgment [Dkt. 41] is granted.

Enter: 23-cv-0617
Date:  April 15, 2025

_____
Lindsay C. Jenkins

25